UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

Eastern District of Kentucky
**FILED**

NOV 0 1 2018

AT LEXINGTON
ROBERT R. CARR
CLERK U.S. DISTRICT COURT

UNITED STATES OF AMERICA

V.

INDICTMENT NO. 5:18-CR-154-JMH-MAS

KEITH FOLEY

\* \* \* \* \*

**THE GRAND JURY CHARGES:**

**STATUTORY BACKGROUND**

1.  In 1938, Congress passed the Federal Crop Insurance Act ("Act"), 7 U.S.C. § 1501 *et seq.*, in order to promote the economic stability of agriculture in the United States through, in part, a system of crop insurance.

2.  In furtherance of this purpose, Congress established the Federal Crop Insurance Corporation ("FCIC"), which was authorized to insure crop losses due to drought, flood, or other natural disaster, as determined by the United States Department of Agriculture (USDA). 7 U.S.C. §§ 1503 and 1508. Tobacco, wheat, corn, and soybeans were among the crops for which insurance was authorized under the Act. 7 U.S.C. § 1518.

3.  The Act only authorized the extension of insurance coverage to producers, that is, a person or entity with a bona fide insurable interest in a crop as either an owner-operator, landlord, tenant, or sharecropper. 7 U.S.C. § 1520. Farmers are producers. A crop

insurance policy under the Act provided payments to a farmer when bad weather (freeze, drought, etc.) or other such naturally occurring events caused the harvest for the farm to be less than the amount specified in the insurance contract or written policy agreement, also known as the "guarantee." These federally-backed crop insurance policies are referred to as multi-peril crop insurance ("MPCI") policies.

4. Farmers who opt to insure their crop are required to take out insurance policies prior to the growing season. Farmers generally do not pay their policy premiums until the growing season has ended and when the farmer knows whether or not his or her yield (i.e., the amount of crop harvested from a specific farm) justified an insurance claim. If the farmer makes a claim under his or her crop insurance policy, then the insurance premium is typically deducted from the amount paid out to the farmer under the policy.

5. Under the crop insurance program, eligible farmers are paid benefits based, in part, on factual representations as to the amount of crop harvested and sold and the cause of loss.

6. The insurance coverage, also called the guarantee, and premiums of coverage are based on four or more years of production records for a particular crop grown by a farmer on a specific farm designated by its unique Farm Serial Number ("FSN"). This means that the farmer's actual production history ("APH") determines the insurance policy's guarantee, based on how much of that crop the farmer has produced on that FSN during each of the four years immediately preceding the year for which insurance is sought. 7 U.S.C. § 1508. If a farmer has produced that crop for more than four years, the guarantee will be based upon that farmer's production history of those preceding years, but no more

than ten years of production history will be used. 7 U.S.C. § 1508. A new producer is a person who has not actively engaged in farming of the crop sought to be insured in the county for more than two years. 7 C.F.R. § 400.52. New producers are given an estimated production yield based upon the county average production for the crop for the past 4 years. See 7 C.F.R. §§ 400.52(m), 400.52(p) and 400.55(b)(6). New producers can get a higher guarantee than a farmer with consistently reported losses.

7. Through the federal program, a farmer can elect to insure tobacco crop up to 75% of the APH guarantee. If a farmer elects 75% coverage on his tobacco crop, that farmer needs to sustain crop damage in excess of 25% to trigger a claim payment. A farmer can elect to insure corn and soybean crops up to 85% of the APH guarantee and may elect revenue protection.

8. The Risk Management Agency ("RMA") is an agency of the USDA that supervises the FCIC and administers all programs authorized under the Act. 7 U.S.C. § 6933. Most crop insurance is sold by approved private insurance companies, called Approved Insurance Providers ("AIPs"), through an insurance agent working on behalf of the AIP. AIPs are reinsured by the FCIC/RMA under provisions established in a Standard Reinsurance Agreement ("SRA"), a contract between the AIPs and RMA. The FCIC/RMA also pays, or subsidizes, a portion of the premium paid by the farmer.

9. The insurance agent obtains basic information from the producer pertaining to the crop to be insured. This information is reported on forms the producer sends to his or her agent. The producer and agent acknowledge on these forms that failure to report completely and accurately may void the applicant's crop insurance policy and may result

in criminal or civil false claims actions. The crop insurance agent forwards this information through the insurance company to FCIC/RMA. This information, including the Production Worksheet, is used to calculate the premium to be paid by the producer for the insurance, and is also used to calculate the indemnity in the event of a loss claim.

10. Producers often elect to take their crop to harvest even after the crop has sustained damage. A Production Worksheet is used to record the amount of harvested production to include crop sales, quality assessments, and harvest appraisals, among other things, to ascertain the production to count, or actual yield, used in determining the indemnity due. The producer certifies on this report that failure to report completely and accurately may result in the voiding of the applicant's crop insurance contract and may result in criminal or civil false claims actions.

11. The FCIC tobacco crop provisions provide for quality loss adjustment should the burley tobacco crop sustain damage reducing the quality of the crop. RMA's procedures for burley tobacco rely on grades assigned by Agriculture Marketing Service ("AMS") graders using USDA Official Standard Grades. The lowest grade quality is a No Grade ("NOG"). A loss that reduces the quality, or grade, of the tobacco can result in an increased indemnity.

12. According to RMA established procedures, if the producer believes he or she has a potential loss of quality, he or she must determine which bales of tobacco need to be graded. The Tobacco Administration Grading Service ("TAGS") was established to facilitate the grading process and provide scheduling services via telephone or a website. A producer with a potential loss of quality can schedule an inspection with the AMS grader

by contacting TAGS. The producer may ask his or her crop insurance agent for assistance in scheduling an inspection. The producer is charged a fee for the grading process. The producer receives a unique Grading Confirmation Number ("GCN") intended to track the bales graded. AMS electronically transmits the GCN information to RMA. Tobacco bales designated as NOG receive the highest discount factor resulting in a higher amount of loss, and thus, higher indemnities. The grade, weights, and other relevant information is transmitted to the appropriate insurance company to complete the claim.

13. When a loss is paid on a crop insurance policy, the loss is calculated by the AIP and paid to the producer, often through the agent. Pursuant to the SRA, the AIP is reimbursed by the FCIC/RMA.

14. Insured producers are required to retain documentation related to their crop from planting through the disposition of their crop, including receipts for seed and other expenditures. They may be required to turn this documentation over to their agent or AIP to justify claims of loss or other inquiries.

15. In addition to federal insurance coverage, a farmer may also elect to obtain private insurance coverage. The private market offers insurance coverage directly to the producer to cover specific perils, such as hail, wind, and fire. State insurance departments regulate private crop insurance; FCIC does not reinsure or regulate private insurance.

16. Private crop hail policies provide additional coverage and protection for the erratic damage hail can cause to a crop. The advantages of a private crop hail policy are the availability to purchase from several private insurers for a variety of crops, claims are often paid following the damage assessment (i.e., even paid before harvest), and insurance

may be purchased at any time during the growing season. Private crop hail insurance providers establish limits to the amount of dollar coverage for crops and premium rates.

17. Private crop hail insurance is popular in areas prone to hail events during the growing season. The producer may use private hail crop insurance as a tool to reduce the risk between the value of their crop and coverage available with the MPCI policy. The difference between the actual production and the coverage level is often referred to as the "gap" in coverage or a deductible. For example, if tobacco is insured at 75% (the maximum allowed by the MPCI policy) of the production guarantee, the gap coverage is 25%. The producer may use private hail crop insurance as a tool to reduce the risk between the value of their crop and coverage available with the FCIC.

18. AIPs often offer combination policies to their customers, whereby producers can obtain a combination MPCI and private insurance coverage for their crop. In this scenario, the federal government continues to reinsure the MPCI indemnities, while the private company backs the private policy.

19. To report a claim of loss on a private insurance policy, a producer notifies his insurance agent or adjuster of the damage and an adjuster must visit the field to assess the damage. The adjuster completes a detailed test sheet, which evaluates the percentage of damage to randomly selected plants throughout the field, on a leaf-by-leaf basis. Adjusters and producers sign these test sheets as certification of their accuracy before submitting to the insurance provider. Producers and/or adjusters also photograph the damaged fields. These photographs are also submitted to the insurance provider as proof of the claim of loss. Once the claim of loss is complete, an insurance provider can pay out

on the claim as soon as they are satisfied with the assessment of damage, which is often within days or weeks of the report of loss.

## FACTUAL BACKGROUND

20. At all times relevant hereto, KEITH FOLEY owned and rented farmland in Bourbon and Jessamine Counties, in the Eastern District of Kentucky. He produced tobacco, among other crops. From at least crop year 2007, and continuing until crop year 2017, FOLEY obtained crop insurance covering his tobacco crop. The AIPs servicing FOLEY's tobacco insurance policies included Great American Insurance Group, Heartland Crop Insurance, AgriLogic Insurance Services, ARMtech Insurance Services, and Producers Ag Insurance Group.

## COUNTS 1-4
## 18 U.S.C. § 1014

21. Paragraphs 1 through 20 above are re-alleged and incorporated herein by reference.

22. On or about the dates listed below, in Bourbon and Jessamine Counties, in the Eastern District of Kentucky,

### KEITH FOLEY

knowingly made false statements and reports for the purpose of influencing in any way the action of the FCIC, and companies the FCIC reinsures, upon an application, advance, commitment, loan, and insurance agreement or application for insurance or a guarantee, to wit:

| Count | Dates | False Statements |
|---|---|---|
| 1 | March 6, 2011 | FOLEY reported to his AIP on his Production and Acreage Report that he produced 3,605 pounds of harvested tobacco for crop year 2010, when he knew he produced additional pounds of tobacco he failed to report |
| 2 | August 27, 2011, September 18, 2011, and February 14, 2012 | FOLEY reported to his AIP on his Production Worksheets that he produced 4,235 pounds of harvested tobacco for crop year 2011, when he knew he produced additional pounds of tobacco he failed to report |
| 3 | March 3, 2015 | FOLEY reported to his AIP on his Production Worksheets that he produced 32,311 pounds of harvested tobacco for crop year 2014, when he knew he produced additional pounds of tobacco he failed to report |
| 4 | February 5, 2016 | FOLEY reported to his AIP on his Production Worksheets that he produced 51,229 pounds of harvested tobacco for crop year 2015, when he knew he produced additional pounds of tobacco he failed to report |

All in violation of Title 18, United States Code, Section 1014.

## COUNT 5
## 18 U.S.C. § 1349

23. Paragraphs 1 through 22 are realleged and incorporated as if fully set forth herein.

24. From in or about mid-2012, through in or about early 2016, in Bourbon and Jessamine Counties, in the Eastern District of Kentucky, and elsewhere,

**KEITH FOLEY**

and others knowingly and intentionally conspired with each other to commit mail and wire

fraud, in violation of 18 U.S.C. §§ 1341 and 1343.

## PURPOSE OF THE CONSPIRACY

25. It was the purpose of the conspiracy to profit through the filing of false and fictitious insurance claims.

## MANNER AND MEANS

26. In 2012, FOLEY obtained a private crop insurance policy to cover his tobacco production. On or about October 12, 2012, FOLEY and M.M., his adjuster at the time, signed a Tobacco Test/Burley Survey Sheet falsely reporting the percentage of damage to his 22 acres of tobacco crop. Portions of this Tobacco Test/Burley Survey Sheet were slightly altered duplicates of the test sheets of another producer in the area reporting on five acres of land.

27. In 2014, FOLEY, in conjunction with M.M., now FOLEY's insurance agent, caused a private crop insurance policy to be issued in FOLEY's name.

28. On or about October 7, 2014, the signatures of T.S. and D.S. (FOLEY's adjusters for that year) appear alongside of FOLEY's signature on a Tobacco Test/Burley Survey Sheet falsely reporting the percentage of damage to his 9.5 acres of tobacco crop. This Tobacco Test/Burley Survey Sheet was a slightly altered duplicate of the Tobacco Test/Burley Survey Sheet submitted for another producer in the area on 4 acres of land.

29. On or about September 25, 2015, FOLEY and T.S. signed a Tobacco Test/Burley Survey Test Sheet falsely reporting that his tobacco crop experienced a hail/wind loss on July 14, 2015. The photographs submitted with this claim of loss are duplicates of photographs submitted with the claim of loss of another producer.

30. The adjusters stored, shared, and submitted these test sheets amongst each other, using interstate wire communications. The adjusters stored, shared, and submitted the photographs using interstate wire communications.

31. The false Crop Year 2012 test sheet was eventually mailed to FOLEY's AIP, AgriLogic, in Kansas, for the purpose of processing the insurance claim of loss FOLEY submitted on his private insurance policy for Crop Year 2012.

32. The false Crop Year 2014 and 2015 test sheets were eventually mailed to FOLEY's AIP, ARMtech Insurance, in Texas, for purposes of processing the insurance claims of loss FOLEY submitted on his private insurance policies for Crop Years 2014 and 2015.

All in violation of 18 U.S.C. § 1349.

## FORFEITURE ALLEGATION
### 18 U.S.C. § 982

In committing the felony offenses alleged in Counts 1 through 5 of this Indictment, each punishable by imprisonment for more than one year, KEITH FOLEY shall forfeit to the United States, pursuant to 18 U.S.C. § 982(a)(2)(A), any property constituting, or derived from, proceeds obtained directly or indirectly, as the result of violations of 18 U.S.C. § 1014.

The property to be forfeited includes, but is not limited to, the following:

**MONEY JUDGMENT:**

$480,304, representing the approximate amount of proceeds derived from crop insurance fraud.

**SUBSTITUTE ASSETS:**

If any of the property listed above, as a result of any act or omission of the defendant,

(1) cannot be located upon the exercise of due diligence
(2) has been transferred or sold to, or deposited with, a third party;
(3) has been placed beyond the jurisdiction of the Court;
(4) has been substantially diminished in value; or
(5) has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States to seek the forfeiture of any other property in which the above defendant has an interest, up to the value of the judgment described above and pursuant to 21 U.S.C. § 853(p), as incorporated in 18 U.S.C. § 982(b)(1).

**A TRUE BILL**

*/s/ Robert M. Duncan, Jr.*
**ROBERT M. DUNCAN, JR.**
**UNITED STATES ATTORNEY**

## PENALTIES

**COUNTS 1-4:**  Not more than 30 years imprisonment, $1,000,000 fine or twice the gross gain or loss, and 5 years supervised release.

**COUNT 5:**  Not more than 20 years imprisonment, $250,000 fine or twice the gross gain or loss, and 3 years supervised release.

**PLUS:**  Mandatory special assessment of $100 per count.

**PLUS:**  Restitution, if applicable.